Good morning, John Ballas on behalf of defendant Troy Urie. There are three arguments in my brief and I hope to touch on at least a little bit on all three of them. The first argument is that the government improperly admitted evidence of two uncharged frauds under Federal Rules of Evidence 404B. Let me ask you about that. The scheme here was pretty fancy. I wouldn't have thought of it if I were trying to write fiction about a scheme to steal. My guess is that the jury might well have thought it was too unlikely unless there was evidence that this particular criminal was smart enough to figure out this very subtle scheme. So the theory for admission that the district judge accepted was that the other schemes that were similar show that this is the sort of subtle scheme and the particular scheme that Urie and his friends use. Why doesn't that fall within the 404B exception? Well, I think the question is whether Urie was one of the participants or not. The actual evidence of the plan and the scheme was pretty much uncontested. He just says, I had nothing to do with it and my girlfriend's telling a crazy story. This is just made up. Essentially, yes. And in those circumstances where you have Lottie Tulaner who is involved, evidence of both of the other two schemes, and the question is whether Urie is involved with them, with Katie McGuire and Orangy or not, and he's saying that he's not. He made some phone calls with them, but that's it. I think it's a it's a lot different question than whether he was present and what the what the kind of the plan was. The only question here was identity was whether he was one of the participants. Well, that's not the only question. Maybe that's, you know, one of the primary questions the defense hung its case on. But fact still remains, the government had to prove the other elements, right? Certainly the government has to. You didn't stipulate that everything else was true. That's absolutely correct. The government has to prove each element of the offense. But when you when you're determining the the marginal probative value and you're weighing the prejudice here, it makes a difference. What is the disputed issue? And here we have a trial with one fraud involving about seven hundred eighty eight thousand precious metals. The government presents in additional evidence, much more evidence than they did on the one charge fraud of an eleven million dollar fraud. And then an additional one from Lottie to Rainer that everyone agrees that Troy Urey had no involvement whatsoever in. And under the circumstances, because it had such marginal probative value, if any, I think that the prejudice is far outweighed and it was inadmissible in the rule for three. With respect to the second uncharged fraud, the applied materials fraud scheme in August of 04, there's an additional objection that the government agent testified on the basis of hearsay rather than on what he directly observed. And that evidence should have been inadmissible on that basis as well. I do want to move to the to the improper cross-examination and closing argument of the government, and I want to focus on. Could we back up to something on the evidence first? Sometimes other bad acts evidence is super prejudicial. A person is charged with something that doesn't arouse the emotions and the government puts in other bad acts that do arouse the emotions. The crime may be some money crime, but the other bad acts involve sex or violence. In this case, the other bad acts don't arouse emotion. Particularly, they may arouse admiration in the jury, stealing millions of dollars from a big corporation by cleverness. And it seems like the risk of unfair prejudice is low and the similarity of the scheme is high. So from a strict 404B, it looks OK, and from a 403, it looks OK. What am I missing? I agree that it's not the same kind of inflammatory evidence of like violence or sex offenses. But here the one charge act is one scheme of seven hundred and eighty thousand dollars worth of metals. A few months later, the government presents evidence of a much larger scheme involving eleven million dollars in precious metals. Of course, you know, one way to temper that is to not to oppose the evidence entirely, but suggest to the court, well, all right. You know, maybe you can let this in, but you should prohibit mention of the amount involved. So the other thing is, you know, the other thing is that the charge is so large that it's not done at the trial level. Did you do that? That was not done at the at the at the trial level. Well, that seems to me the primary prejudice you're arguing about. Right. It's so much bigger than the charge. Well, one one is it so much bigger. And second, is that it actually it actually took a much greater part of the trial. The trial on the charge, the Agilent Technologies Fraud, involved a smaller number of witnesses, less witnesses. In the Sanlima Fraud, there was actually two FBI agents instead of one. There were six witnesses. I know, but the fact that it took so much longer is really more, you know, a problem with trial management. I don't think that's what you can argue prejudices your client because it took longer. Well, it's when when the jury is hearing much more evidence about additional acts, it kind of tends to distract them from what. It's a kind of an invitation. It's kind of an invitation to a closing argument that says you didn't hear much about the crime charge. You heard a whole lot about another one. So why didn't they charge him with the other one that they claimed to have evidence for instead of the one they charged him with, which judging from the amount of time they took a trial, they don't. And that's well, that's part of the problem was he actually went to trial in the Sacramento one. And he was he was because of the third fraud scheme that came in. He was the jury was told by the agent that he had nothing to do with that third fraud. But it kind of leads the jury to believe that. I mean, why not? Why wouldn't if he was involved in these two? Why wasn't he involved in that third one? And it kind of forced him to have to kind of get up and explain that he was in custody during the Sacramento offense. And that's why he wasn't involved in the third fraud. And the government's closing argument, there's a number of points I brought out on different and proper crossing and closing arguments. I want to point out a few things. There are admittedly sometimes that the defendant did not object at all. But there are other times in particular where he did object. So I think that the review should be for harmless error. Most of the most of the errors that which relate to the cross-examination of the defendant were not objected to, were they? Well, some of them were. In the beginning of when they asked Troy Urey to test the comment and the testimony of Agent Artley, at Excerpt of Record 111, there is an objection made. I said, do you agree with that, what he just said? And the defense counsel says objection. The government argued that was to the form of the question. But I think in context, it was actually a louching objection. Yeah, but that objection, I would say, was not really followed through on. It wasn't followed through as well as it should have. But then in addition, when the government's counsel, the prosecutor, is asking Troy Urey about the phone records and the location of the calls, the defense counsel at Excerpt of Record 119, and I believe 90, objects twice, once calls for speculation and then assumes facts not in evidence, which is essentially what we're arguing here on appeal, that the government overstated what the expert had testified about what you can show from the phone records. So I think that the review really should be properly for harmless error and that all the instances of improper cross and closing should be considered in determining the prejudice in this case. And this was not a overwhelming case in any sense. In fact, when the kind of the counterpart was tried in Sacramento, it was reversed on the same ground of improper cross-examination and closing argument. And the Court commented that this case was a close one. And in fact, in that one, there was probably more evidence because it had to do with the Sacramento stamina fraud rather than the Agilent Technologies fraud. There was actually two cooperating witnesses. The direct evidence on this case, on the Agilent Technologies, involved just Katie McGuire and phone records that didn't really show what the content of any of the phone calls were. I want to just briefly hit the insufficiency of the evidence in counts three and five before I save the rest of the time for rebuttal. The one thing I want to point out was in order to prove these counts, the government must show, as they agree, that the calls crossed state lines. And there is no evidence that they did. The government agrees that the two phone calls at issue between Orgy and Tulaner at the time the calls were made, they were both in California. They point to one page in a phone record of Tulaner's AT&T phone records at Government Excerpt of Record 427, which notes that it says location of the call and it has the 775 area code of Reno. But there was no expert testimony interpreting these records, unlike there was in the Verizon records. And if you look at that page, it looks like that the area codes there or the locations there listed Reno really just correspond to the location of the person of the incoming call. So when you see that, like Orgy's phone number is a 775 area code, and then it says Reno, there's no testimony saying that that call crossed state lines at all. And I don't think you can infer that from the record. I'm not sure you followed that. What page was that again? ER 427. Thanks. And which one? See how at the bottom there's three calls that say the calls are made. Three calls. The 775 area code and then it lists the call location as Reno. But I don't – there's no way to know from those phone records without any expert testimony interpreting it that the call was actually crossed the state line over into Reno when both callers were actually in California. And whether that 775 Reno, Nevada listed there may just refer to the 775 area code the way it lists Campbell, California under 408 and Spokane under area code 509 elsewhere on that page. Let's see. 775, where's that? Reno. Reno. Why would anyone look at this and not think it was a call? 818, is that L.A.? Yes. Southern California. Why would anyone look at this if it was a phone bill? Well, I think it means that the 775 number that – the 775 number is in Reno. But if it's a cell phone and that person is physically in California and you call another person in California, that call doesn't necessarily go to Reno. No, but there was – there was expert testimony. About the Verizon phone records. But in that situation, many times it could be routed that way, right, if it's traffic less and so forth, stuff like that. So what are you saying, that FactFinder couldn't rely on the expert testimony with – not just the expert, but the employee testimony with respect to how Verizon operates and – Extrapolate. Yeah, that's, you know, common in the industry? Well, I think you can't because even the records listed, each phone company has different types of records. For example, on the AT&T records, it just says incoming. It doesn't even list what the phone call was, you know. And that's just too big of an inference to make without any kind of testimony about how AT&T operates. Thank you. Counsel. Good morning, Your Honors. May it please the Court, my name is Mary Jean Chan and I represent the United States in this appeal. The defendant raises numerous claims, none of which warrant reversal in this case. Today I'd like to review three of those major claims. One, regarding prosecutorial misconduct. Could you start with the – The sufficiency? Other bad acts? Sure, absolutely, Your Honor. I believe that this Court, what the panel has said is absolutely correct, that there was no abusive discretion on the part of the district court in admitting either the 404B evidence on Sanmina against Yuri because that showed his identity, it showed his intent, it showed his lack of preparation, it showed his modus operandi. Okay. Remind me exactly what the evidence was. This is a very complex case and it's very easy to get mixed up on it. Absolutely, Your Honor. The evidence on the Agilent scheme or the Sanmina scheme? Each. Summarize. The evidence was primarily direct evidence from Katie McGuire, who was a co-conspirator in the scheme. She said that Yuri had recruited her from Reno to act as a receptionist or somebody to pick up packages for him. Emails were made to Alpha Azar, which Mr. Zubio testified to, which purported to want to buy precious metals, about $700,000 in precious metals. We're talking the Engelhardt scheme now. We're talking about the charged scheme, which is Agilent's. I thought Engelhardt metals was the $11 million one. No, that's the 404B evidence. That's what I was asking about. I'm sorry. I thought you had wanted to hear about both. I was going to. Okay. Well, I would like to. I'll move on. There are two other schemes that came in under 404B, correct? That's right, Your Honor. That's correct. That's absolutely right. So with respect to the Sanmina scheme, the evidence was from also Katie McGuire that she had been recruited after completing the Agilent scheme, which is the charged scheme, to, again, act as a receptionist, to stay at a warehouse to receive stolen materials. In this case, she was also asked to recruit somebody who would pose as a security guard, which she did, her friend Nicholas Blanchard. Nicholas Blanchard also testified consistently with McGuire, and phone records also showed consistently with her that there was communication between these parties. Orji then helped them, in connection with Uri, to set up a warehouse in Sacramento. This warehouse, the deposit was made in the name of Steve Bruton. Steve Bruton was the person whose alias was used to communicate with Engelhardt in order to procure the precious metals. There was evidence from the bank of surveillance photos of Uri actually going and buying a check in the name of Steve Bruton. So you had photographs of Uri tying him to the Engelhardt scheme? Absolutely. There are photographs of him from Bank of America. I think it was Bank of America. Maybe it was Wells Fargo. I apologize, Your Honor. But there are photographs, clear photographs of him purchasing a check in the name of Steve Bruton, who was the alias used in that. There were e-mails that were received in the name of Steve Bruton requesting a purchase of precious metals. Okay. You answered my question on that. Okay. Thank you, Your Honor. So, but I would just reiterate that I agree with what the comments were voiced by the panel in the previous part of the argument, that there was absolutely a ground for admitting the evidence both on Uri as well as to Lehner in the applied material scheme. And just as an aside, although the quantity of evidence is irrelevant, and Judge Kishima is absolutely right, if it was more, then it was a matter of trial management. As a matter of fact, when you look at the record, the evidence on Sanmina was not greater than that on Agilent. There are approximately 90 pages of testimony on Sanmina versus approximately 135 pages on Agilent. So that's just not true what the – what appellate counsel has stated. So I'd like to go back and first talk about the prosecutorial misconduct claims in this case. There was no prosecutorial misconduct. The prosecutor in this case did – Well, conduct was very similar, wasn't it, to the prior trial, the one in Sacramento, you know? It seems to me it's almost a repetition of that trial. And I think that's what the appellate counsel is trying to make this Court think. But actually, I think it's very different. The questioning here did not ask the defendant whether the special agent had made up or lied about his testimony. Well, he almost – just about asked him, you know, are you saying that the agent was lying, right? He asked him that question. He absolutely did not, Your Honor. Well, it's very close to that. He – well, I think he didn't. He asked the question whether he believed that special agent Artley had been mistaken about certain testimony and whether the defendant agreed that the special – would agree – would agree, do you agree, was exactly what he asked, with what special agent Artley had testified. The context of this questioning has to be examined in figuring out whether the prosecutor was trying to do what the proper function of cross-examination is, which is just flesh out exactly what the testimony was of Urey, or whether he was asking for, impermissibly, a credibility judgment. I would submit that the evidence here clearly shows that what he was doing was fleshing out Urey's testimony. On direct, Urey testified, and this is at excerpts of record 264 to 265 of the government's excerpts. He testified in reference specifically to agent Artley's testimony that he had indeed written by his own hand on agent Artley's notes that he had reviewed those notes. That's what his direct testimony is. And, however, he disavowed any of the inculpatory statements on agent Artley's notes from this interview. So on cross-examination, very naturally the prosecutor asked whether Urey had, in fact, ever reviewed the notes before writing that he had reviewed the notes on the notes and whether he had had an opportunity to review those notes. And so the question, the line of questioning on government of excerpts of record 305 with which Urey takes issue really gets at that. So the question was whether he believed that agent Artley was mistaken when he said that this, referring to the notes, was shown to you. That was clearly getting at whether he had ever reviewed those notes. The questioning on government of excerpts of record 310 to 312 was the same line, along the same line. It happened to use the construction mistaken in asking the questions, but the question was still there. By the way, on this line of questioning, you think it's plain error? Absolutely, Your Honor. There was no objection made to any of the three lines of questioning that was made. To the extent that there was any objection, it was really to the form and it was not, as Your Honor pointed out, properly preserved. And the mistaken construction in the second instance was actually clarified because Urey tried to say, well, are you asking for my opinion about the truthfulness of Special Agent Artley? And the prosecutor clarified that what he was asking was, do you agree? Now, the do you agree construction, the mistaken construction, may be somewhat similar superficially to the lying words or the made-up questions. But as this Court's case in Dacino clearly specifies, that kind of construction is within the permissible scope of cross-examination. Dacino states that where a prosecutor had asked specifically the defendant, now, are you saying that this other witness was in error and repeatedly had sentences or questions like that, that the rule, which is that the prosecutor cannot force or compel a defendant to comment on another witness's veracity, had, quote, no application to the facts here. And this Court in Dacino also said strongly, quote, that the right to cross-examine a witness is fundamental in our judicial system. Quote, Vigorous and searching cross-examination is a powerful instrument for the ascertainment of truth. Appellate courts particularly are loath to lay down rules which might unduly restrict the latitude of cross-examination. The proper limit of fair cross-examination is a matter within the sound discretion of the trial court. And the trial court in this case, which was very attentive, made numerous limiting instructions, was very careful to preserve the defendant's rights and have a fair trial, did not find any error in this line of questioning. With respect to the Verizon questions, which is the Ninth Circuit case that says mistaken is okay even though lying is not okay? It doesn't. It's Dacino, Your Honor. And the citation is 192 F. 2nd at 369. That's a pretty old case, 1951. It is an old case, but there are no other cases since then which say that mistaken or an error is incorrect. So even if this Court is inclined to find that there was some sort of error, it's certainly not plain. Every single other case in the Ninth Circuit, and actually beyond the Ninth Circuit that has – that have talked about this area, have had constructions or have talked about questions where a defendant or a witness was asked, are you saying that this  Are you saying that this other witness was a liar? Are you saying that this other witness made up his testimony? Have we reversed any for mistaken? No. No, absolutely not, Your Honor. The only case in this area that's even talked about mistaken, other than Dacino, is a Second Circuit case in Richter, U.S. v. Richter. And in that case, the court there said that because the defendant had been given the option of saying – the question there was do you believe that this other witness was lying or mistaken, that because the option of or mistaken was given, that that would mitigate the having asked the lying because there was an alternative given. And that's, you know, not even binding upon this Court. But there's no plain error, even if this Court is inclined to find that the questions were too close to the line. And also on the question of the Verizon records, again, I would like to refer to the direct testimony that Urey gave, which was that many of the calls that were on the phone records had not been given. His testimony on this was, I remember you, his defense counsel, questioning one of the agents here, and he said that they received records from Verizon Wireless, and then they created a summary. It's quite possible they made a mistake or an error. That's at Government of Excerpts 300 to 301 on his direct testimony. The cross-examination on this point clarified simply whether Urey was claiming that the agent who had compiled these records for analysis had erred in his analysis, that is, Agent Umbel, or whether he was saying that Verizon itself had erred in its records. And the question was, you know, would you agree that if these records came from Verizon, they would be accurate? And he essentially agrees, yes, they would be accurate. And then the follow-up question is, well, then, would you agree that these exhibits, these phone records were, quote, at least that these documents came from Verizon? So the construction of the question, or at least that the truthfulness that these documents came from Verizon, refers not to the truthfulness of the declaration that these are actually truthful documents, but that somebody said that these documents came from Verizon. So that was, again, within the proper scope of cross-examination. Moreover, even if this Court finds that there was plain error, there was no prejudice, absolutely no plain prejudice in here. Unlike the case in Combs, there was strong, there was direct evidence of Mr. Urey's culpability. Other than this admission, the primary contest, the credibility contest in this case, was between Katie McGuire and Troy Urey, the defendant, not between Troy Urey and Agent Artley. That was an ancillary issue having to do with his admission in the Sanmina evidence. That was not the primary credibility dispute in this case. And there was also other evidence, unlike in Combs, where there was no other direct evidence. McGuire was an eyewitness who testified that Troy Urey had recruited her, had directed her, had paid for her, and sent her back off to Reno after the adjuvant theft, and had recruited her again and paid her $3,000 for this. Finally, there was no prejudice because any error that this Court might find was not compounded by any reference in closing argument. The closing argument, as with respect to both McGuire and Agent Artley, was very laid back. The prosecutor repeatedly told the jury, there's a credibility issue, it's up to you to decide. And you can see that at Government of Excerpts of Record 360, where the prosecutor says, quote, you be the judge, speaking to the jury of who to believe. Well, what's your response to the sufficiency of the evidence argument on the interstate phone call? Well, Your Honor, I think that if you look at the records, as you pointed out, that the phone calls by themselves show a phone call from L.A. to a Reno number. But moreover, that's not all the evidence that there is. A Sprint representative testified, and you see this at Government of Excerpts of Record 80 to 81, that all incoming calls to Orji, who was the recipient of the phone call, were routed through Reno, Nevada, his home market. So not only did he have a phone number that was associated with Reno, all phone calls were routed through his home market through Reno. And the evidence was that Tulaner, who had an area code, who was a California area code, was also in L.A. to receive the material. So that was sufficient evidence, certainly, for the jury to determine that the interstate nexus element had been met. And the standard of review on the sufficiency evidence, Your Honors, is under Jackson v. Virginia, which this Court recently ---- Applying the Jackson standard. Pardon? Applying the Jackson standard. Applying the Jackson standard, yes. Do we need the Sprint agent? The thing that's worrisome about that is it gets us into whether you need an ECNTR of the interstate aspect since none of us really have any idea how our phone calls are routed by the carriers. We don't know where they're bouncing the electrons around. I don't believe that this Court ---- We have the phone bill there, and gee, maybe it could be, well, I guess if I call one of my law clerks, it's an Alaska area code to an Alaska area code, and we're actually calling from California to California. And I guess that's the argument that Urey is making. It might be that way. I didn't take that argument in his briefing, and so there wasn't really any development on that. I didn't get it out of the briefing either. I got it today. Right. Okay. Well, I think that the case law, what I understand from the case law is that when 1343, the Wire Fraud Statute was crafted, the interstate nexus element had nothing to do with a SCIENTR element. It was simply to create jurisdiction for federal jurisdiction. Sure. So that's not an element. But you have to know that you're acting interstate. No, Your Honor. There are a lot of people who used to avoid doing things across state lines precisely to avoid federal jurisdiction. There's no case law ---- Prohibition and such. None of the case law that I reviewed in preparation for this case in respect to 1343 had any SCIENTR element with respect to interstate nexus. And with respect to the contents of the law ---- Your Honor, is there any case that says you don't need it, you don't have to know that you're crossing state lines? I can't recollect specifically, but I believe the cases that I cited in my brief, which are not actually Ninth Circuit cases, I think one of them does say that, that you don't, that it's sort of a strict liability type of situation. And just very quickly, if I might talk about the contents, I think ---- You're over time. Okay. Well, I believe that the ---- there was enough circumstantial evidence based upon the fact that the calls were between co-conspirators, that the loot was driven down to L.A., to the fence, the person initiating the calls, that these calls took within close proximity to the actual theft of the adjuvant materials to support the convictions. And I would ask this Court for an affirmation on all accounts. Thank you. Thank you, counsel. On the prosecutorial misconduct argument, I want to make three points. First, the DiAquino case, the Ninth Circuit case in 1951, it doesn't discuss any distinction between lying and mistaken. They're the questions we're asking the defendant, did you hear the testimony? Was it error? And that's all they asked for here. And the Sanchez case, the Ninth Circuit case, also the questions weren't mistaken, but they cited with approval the Second Circuit's case in Richter as mistaken being equivalent to lying. So it's the Ninth Circuit dicta that mistaken is the same as lying. But it's kind of a distinction that doesn't really matter as much, because in this case, the prosecutor didn't really mention the most egregious questioning. One is that they asked Troy O'Reilly, I'm going to give you two examples. All right, Special Agent Artley wrote that after the fact according to you. It's not just was he mistaken, it's actually asking the comment about his credibility. And with respect to the Verizon records, she pointed out a couple of the questions, but the most egregious one is, would you agree that someone at Verizon Wireless is attesting to the accuracy or at least the truthfulness that these documents came from Verizon? It's a specific question about the truthfulness of these other records. And those questions are improper. And because of the rules. That was not objected to, right? That one was not. That one was not objected to. The court actually had a couple questions down then. To me, it seemed a little silly. Would you agree that your phone bill is accurate? Well, how do I know? If there was an objection, probably be sustained. But there might not be because it wouldn't be seen by the defendant to be advantageous. Well, I think it is an improper question. And because it seems to me it's even more egregious. There are improper questions asked throughout every trial. And typically they're not objected to because both sides know that it makes no difference and it will save a lot of time. For example, improper hearsay is often not objected to because neither side wants to waste an hour bringing up another witness when they both know what he's going to say. Well, that one question alone is probably not that harmful. But in the context of the other improper questions, and after this court has already reversed Uri's conviction for the same type of questioning in the Sacramento case, I think it's even more egregious for the prosecutor to do it here. And this court has already found it to be sufficiently harmful to require reversal, even under plain error review in the Sacramento case, where you have essentially the same cases, just kind of the flip side. Thank you, counsel. Thank you. United States v. Uri is submitted.
judges: Kleinfeld, Tashima, Thomas